**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

JOHN DOE,[1]

      Plaintiff,

v.

ASPEN VALLEY HOSPITAL DISTRICT (d/b/a ASPEN VALLEY HOSPITAL);
ALICIA MILLER, in her individual and official capacities,
DAWN GILKERSON, in her individual and official capacities,
ELAINE GERSON, in her individual and official capacities,
STEPHEN KNOWLES, in his individual and official capacities, and
MICHELLE GELROTH, in her individual and official capacities,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

    Plaintiff John Doe, by and through counsel, Mari Newman, Darold W. Killmer, and Eudoxie (Dunia) Dickey of KILLMER, LANE & NEWMAN, LLP, respectfully alleges for his Complaint and Jury Demand as follows:

## I.     INTRODUCTION

    1.    This is a case about a hospital's public disclosure of an employee's most personal and private medical information and its termination of his employment in retaliation for his having exercised his legal right to object to the hospital's willful and wanton violation of his rights.

    2.    Plaintiff John Doe was hired as a Conference Center Coordinator in 2003 by Aspen Valley Hospital District, a non-profit, public county hospital in Aspen, Colorado ("Aspen

---

[1] Plaintiff intends to file a Motion to Proceed Under Pseudonym.

Valley Hospital," "Aspen Valley," "AVH" or "the hospital"). During his 11-year tenure at

Aspen Valley, Plaintiff was an outstanding, respected, well-liked, dedicated and hardworking

employee who consistently earned "exceeds" and "outstanding" performance evaluations.

Throughout his career at the hospital, Plaintiff continually received ever-increasing

responsibilities and a series of promotions, ultimately joining the hospital's Information

Technology (IT) Department as a Help Desk/ Desktop Technician in August 2013.

3.      Unfortunately, beginning in 2014, Plaintiff's successful career at AVH was

wrongfully cut short through a series of outrageous, illegal, willful and wanton actions

committed by Defendants Alicia Miller, AVH's director of Human Resources (HR), Health Plan

Administrator and, ironically, the Privacy Officer for the Health Plan, Senior HR Specialist

Dawn Gilkerson, Chief Counsel and Chief Nursing Officer Elaine Gerson, Chief Compliance

Officer Stephen Knowles and Michelle Gelroth, the Associate IT Director and Plaintiff's direct

supervisor as of May 2014.

4.      The gears for Plaintiff's illegal and retaliatory termination were set in motion on

or about September 23, 2012, when Defendant Miller intentionally, willfully and wantonly

revealed Plaintiff's closely guarded personal health information (PHI), specifically *his highly*

*confidential HIV positive status*, as a piece of conversational gossip over drinks, to fellow HR

co-worker Marlene Saleeby in flagrant violation of the Privacy Rule contained in the Health

Insurance Portability and Accountability Act of 1993 (HIPAA), codified in 45 CFR §§160 and

164, Colorado privacy protections and AVH's own policies respecting HIPAA privacy

protections. For obvious reasons, Plaintiff had carefully guarded this sensitive medical

information, even concealing it from his family members and close friends. Remarkably

(particularly given her role as "Privacy Officer" for the Health Plan), Defendant Miller's

unlawful breach of HIPAA's privacy protections constitutes only one instance in a longstanding and continuing history of blatant HIPAA violations by Defendant Miller, AVH, and its employees.

5.      Outraged and upset by this obvious breach, and after she was no longer employed by AVH and therefore no longer feared retaliation, Ms. Saleeby finally revealed Defendant Miller's unlawful and improper revelation to Plaintiff on June 13, 2014. Ms. Saleeby also alerted General Counsel and Chief Nursing Officer Defendant Elaine Gerson and Chief Compliance Officer Defendant Stephen Knowles of this blatant violation of Plaintiff's privacy and state and federal law. Although Defendant Knowles, General Counsel and Chief Nursing Officer Defendant Elaine Gerson and Chief Executive Officer Dan Bonk were immediately informed of Defendant Miller's impermissible disclosure, they ignored their legal and ethical obligations by failing to take Plaintiff's complaint seriously, conducting a sham investigation, and attempting to sweep this blatant HIPAA breach under the rug—as they had done many times in the past— quickly concluding Defendant Miller had done nothing wrong.

6.      Disturbed, upset and feeling violated, and reasonably fearing that AVH management would never take appropriate action in response to Defendant Miller's outrageous disclosure of his sensitive HIV positive status, Plaintiff exercised his First Amendment rights and filed a complaint regarding the HIPAA violation with the Office of Civil Rights (OCR) on June 25, 2014. On October 3rd, OCR sent a letter to both Plaintiff and AVH acknowledging its initiation of an investigation, which both Mr. Doe and Defendant AVH received on or about October 7, 2014. On October 21st, just *two weeks* after Defendant AVH learned that Plaintiff had made a formal complaint against Defendant Miller with OCR, in retaliation for his constitutionally protected whistleblowing activity, Defendant AVH issued Plaintiff his *first ever*

disciplinary write-up in his 11 years of dedicated service to the hospital. This was the first step

in an escalating campaign of retaliation, harassment, enhanced scrutiny and completely

pretextual disciplinary action against Plaintiff orchestrated by none other than Defendant Miller

herself, with the help of Defendants General Counsel Elaine Gerson, HR Specialist Dawn

Gilkerson, Chief Compliance Officer Stephen Knowles and directly implemented by Defendant

Michelle Gelroth, Associate IT Director and Plaintiff's then-boss. Recognizing this action for

what it was and seeking justice, Plaintiff made another complaint to OCR concerning this

obvious act of retaliation by Defendants Miller, Gelroth and AVH on October 23rd, 2014.

7.      Due the stress of this relentless campaign of harassment and retaliation against

Plaintiff's constitutionally protected complaints to OCR, his compromised immune system and

worsening tinnitus, Plaintiff took doctor-approved leave pursuant to the Family Medical Leave

Act (FMLA) for four weeks in November 2014, returning to work on December 1, 2014. On

December 3, 2014, just *two days* following his return, Defendants Gelroth and Gilkerson, acting

under Defendant Miller's direction, called Plaintiff into a meeting ostensibly to discuss "Role

Optimization," during which meeting Plaintiff was presented with a new job description for

"Help Desk Coordinator" authored while he was out on FMLA leave by none other than

Defendant Miller. Plaintiff was demoted, stripped of numerous responsibilities and had his pay

reduced by approximately $1,800 per month, in direct retaliation for both his OCR complaints

and his recent FMLA leave. Again understanding this to be a direct act of retaliation by

Defendants Miller and AVH, Plaintiff made a third complaint to OCR on January 3rd, 2015. On

January 10th, 2015, Plaintiff also pleaded for assistance to the Department of Labor in connection

with his retaliatory demotion immediately following his return from approved FMLA leave.

8.     Continuing in December 2014 and January 2015, Defendants subjected Plaintiff to an intensifying campaign of enhanced scrutiny, persistent harassing phone calls and texts on nights and weekends and entirely pretextual disciplinary write-ups by Defendant Gelroth, complicit with and acting at the behest of her superior, Defendant Miller and with the approval of Defendants General Counsel Gerson and Chief Compliance Officer Knowles.  These illegal and abusive actions culminated in Defendants retaliatory termination of Plaintiff's employment on January 22, 2015, severely damaging Plaintiff financially and emotionally and placing his delicate health in jeopardy by cutting off the health insurance coverage he needed to obtain life-saving anti-viral medications to suppress his HIV.  Adding insult to injury and continuing their vindictive and illegal pattern of retaliation, Defendant AHV then contested Plaintiff's request for Unemployment Insurance (UI) benefits in an effort to further jeopardize Plaintiff's ability to afford his medications.

9.     Plaintiff was and continues to be gravely financially, physically and emotionally damaged by Defendants' numerous unlawful actions, including their willful and wanton violation of Plaintiff's Fourteenth Amendment Fundamental Due Process Right to Privacy, willful and wanton invasion of Plaintiff's privacy in the nature of unreasonable publicity given to one's private life, willful and wanton outrageous conduct/ intentional infliction of emotional distress and negligence in revealing Plaintiff's carefully guarded and confidential HIV positive status.  Plaintiff was further harmed by Defendants' violation of HIPAA's prohibition against intimidation and retaliation, their illegal retaliation in response to Plaintiff's exercise of his constitutionally-protected rights under the First Amendment, unlawful retaliation in response to Plaintiff's taking approved FMLA leave and ultimately, by AVH's wrongful, willful and wanton discharge of Plaintiff in violation of public policy.

## II.     JURISDICTION AND VENUE

10.     This action arises under the Constitution and laws of the United States and the State of Colorado, and is brought pursuant to Title 42 U.S.C. § 1983 and the Family Medical Leave Act, 29 U.S.C. § 2615(a) ("FMLA").

11.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## III.     PARTIES

13.     Plaintiff John Doe is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Plaintiff Doe was employed by the Aspen Valley Hospital District.

14.     Defendant Aspen Valley Hospital District d/b/a/ Aspen Valley Hospital ("Aspen Valley Hospital," "Aspen Valley," or "AVH") is a Colorado corporation, with a principal street address of 0401 Castle Creek Road, Aspen, CO 81611.

15.     Defendant Alicia Miller is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Alicia Miller was employed by the Aspen Valley Hospital District.

16.     Defendant Dawn Gilkerson is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Dawn Gilkerson was employed by the Aspen Valley Hospital District.

17.     Defendant Elaine Gerson is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Elaine Gerson was employed by the Aspen Valley Hospital District.

18.     Defendant Stephen Knowles is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Stephen Knowles was employed by the Aspen Valley Hospital District.

19.     Defendant Michelle Gelroth is a citizen of the United States and a resident of and domiciled in the State of Colorado.  At all times relevant to this Complaint, Defendant Michelle Gelroth was employed by the Aspen Valley Hospital District.

## IV.     FACTUAL ALLEGATIONS

### *Plaintiff was an outstanding, successful and dedicated employee at Defendant Aspen Valley Hospital for 11 years*

20.     Plaintiff was hired by Defendant Aspen Valley Hospital in November 2003 for the position of Conference Center Coordinator, beginning a successful and dedicated career of over eleven (11) years of service for the hospital.

21.     Throughout his lengthy tenure at Defendant AVH, Plaintiff was well-liked by colleagues and consistently earned promotions to positions of increasing responsibility.

22.     In August 2013, Plaintiff received a promotion to the position of Help Desk/ Desktop Technician, joining the IT Department and challenging himself to learn new technical skills in troubleshooting computer issues for the hospital.

23.     In this role, as in the past, Plaintiff was sought out by Aspen Valley staff members who came to him with various computer issues for providing excellent and friendly customer service.  Indeed, then-Chief Executive Officer Dave Ressler and IT Director David Bingham both described Plaintiff as the "go to guy" at the hospital.

24.     For the vast majority of his more than decade tenure at Defendant AVH, Plaintiff excelled in each role and earned outstanding and exceeds performance reviews, never receiving a merely standard or satisfactory review.  In his annual reviews, Plaintiff's supervisors consistently noted his effectiveness at his job, his many positive contributions to the hospital and his courteous, helpful attitude and customer-centered approach.

25.     In 2011, Plaintiff worked directly with then-CEO Dave Ressler in the formation of the new Clinical Integration Committee, which was created to help reign in ever-increasing healthcare costs.  Plaintiff also worked closely on many hospital-wide issues with Board of Directors Chairman Dr. Barry Mink and other Board members.

26.     In his 2011-2012 performance review, Plaintiff earned an "Outstanding" rating and a superlative numerical score of 1.88 out of a possible 2.00.

27.     In his 2012-2013 performance review, which was approved by Defendant Miller and in which Plaintiff received an "Exceeds" rating, Plaintiff earned the following praise from his supervisor, who noted his desire to go above and beyond by taking on extra responsibilities and taking the initiative to join several hospital-wide committees:

> [Plaintiff] is very accountable for his actions and his job duties.  He has taken on additional duties this year, and is striving to succeed in those areas… [Plaintiff] is an outstanding team player—always happy to get involved in something new or willing to assist another employee.  [Plaintiff] is the "go-to" person when the administrative assistant is out of the office.  [Plaintiff] has also taken on additional work this year – the service excellence committee, emergency management committee, and the education committee.  Of note – [Plaintiff] was again nominated for a 'bear hug' due to his teamwork… [Plaintiff] has a high rating for courtesy and sensitivity… Also – [Plaintiff] is very customer centered as it relates to meeting the needs of his customers… [Plaintiff] is very trustworthy – and therefore is called upon to assist in matters not necessarily part of his job.  [Plaintiff] does a fantastic job with the call schedule and the 'ready reference' packet each month.  He is extremely diligent.

28.     In his 2013-2014 performance review, which was approved by Defendant Miller as well as by then-Chief Financial Officer and the current Interim Chief Executive Officer Terry Collins, Plaintiff again earned an "Exceeds Rating."  His new supervisor, IT Director David Bingham, who personally recruited Plaintiff to this new role in order to improve customer service in the IT Department, lauded Plaintiff on his ability to quickly learn new skills in transitioning to his new position in the IT Department, to build relationships and help out whenever needed:

> [Plaintiff] came into a new department this year and has applied his organizational knowledge and demeanor from his former role to his IT role.  He excels and [sic] being accountable for his actions.  He follows through on all commitments and clearly takes pride and ownership of his new IT duties.  [Plaintiff] has had to learn many new processes on his own and he quickly developed an ability to understand what was asked of his as a front line support person.  [Plaintiff] not only holds himself accountable but he also holds others on the team accountable… [Plaintiff] excels at building relationship within the team and across the hospital.  He immediately took [a] call in his first week when personnel issues created a gap. This is one example of many where [Plaintiff] will pitch in and assist in any manner needed… [Plaintiff] continually models all behaviors of a respectful employee.  He is respectful to all levels of people he encounters from physicians to patients… [Plaintiff] is a "go to" staff member and can be counted on in all situations.

29.     In his entire eleven (11) year career at the hospital, Plaintiff had never once received any write-ups, negative reviews or other disciplinary action until just two weeks after Defendant AVH and Defendant Miller learned that Plaintiff had made a complaint to the Office of Civil Rights against her in relation to her unlawful disclosure of his HIV positive status, the first step in an escalating retaliatory campaign orchestrated by Defendant Miller against Plaintiff that ultimately culminated in his wrongful, retaliatory termination.  The original act that eventually led to this abusive, harassing and unlawful pattern of retaliation against Plaintiff for his exercise of his constitutionally protected rights under the First Amendment was Defendant Miller's wrongful disclosure of Plaintiff's highly sensitive HIV positive status as a piece of

conversational gossip over drinks at a 2012 work event to a co-worker who had no reason to know.

### *Defendant Alicia Miller's Unlawful, Willful and Wanton HIPAA Breach*

30.     Defendant Miller first learned of Plaintiff's HIV positive status in late 2011 or early 2012 when she was tasked with reducing health insurance costs for the hospital, which was self-insured.  In this regard, her task was to review individual health insurance records provided by Regional Care Inc., the hospital's health insurance carrier.

31.     In reviewing these records, Defendant Miller had access to Plaintiff's personal health insurance records, which stood out because his HIV anti-viral medications were expensive and therefore exceeded many of the other employees' health insurance costs.

32.     Following a meeting of the Clinical Integration Committee in 2012, of which Plaintiff was a member, Defendant Miller looked Plaintiff in the eyes, and in reference to a high-cost health insurance claimant, told him "If I ever heard of someone like that, the first thing I would do is to get him off the plan," signaling to Plaintiff she was aware that *he* was the high-cost claimant in question because of his HIV positive status and consequent need for expensive anti-viral medications.

33.     On or about September 23, 2012, Defendant Miller unlawfully, willfully and wantonly disclosed Plaintiff's HIV positive status to her HR co-worker and subordinate Marlene Saleeby, who had no reason to know, as a piece of casual conversational gossip while the two were having drinks after an HR professionals convention in Denver.

34.     Plaintiff was hospitalized at the time, and Defendant Miller remarked to Ms. Saleeby, "I'm just not sure how things are going to get better for [Plaintiff]."  When Ms. Saleeby

asked her what she meant, Defendant Miller told her "I am just worried for him since he is HIV positive."

35.     Shocked and saddened by this news, and stunned by Defendant Miller's unethical disclosure, Ms. Saleeby asked Defendant Miller how she had learned this fact. Defendant Miller explained she knew his status from going through high cost medical claims and that because Plaintiff had a very large claim amount for his anti-viral medications, she had reviewed his file.

36.     Disturbed by Defendant Miller's unlawful, willful and wanton disclosure of Plaintiff's sensitive and confidential HIV status, Ms. Saleeby confronted Defendant Miller (who was her boss) numerous times over the course of the weeks following Defendant Miller's unauthorized revelation.  Each time, Defendant Miller admitted her mistake and apologized profusely to Ms. Saleeby for her unethical and illegal disclosure, indicating her understanding that her action was wrongful.

37.     At the time, Ms. Saleeby wanted to make a formal complaint to management but she was afraid of losing her job, knowing Defendant AVH's and her boss Defendant Miller's history of retaliatory treatment against other employees, described in detail below.

38.     Two years later, after Ms. Saleeby was no longer employed at Defendant AVP, and thus no longer feared Defendant Miller's wrath, she informed Plaintiff of Defendant Miller's outrageous, illegal and unethical disclosure, because the two were friends and Ms. Saleeby felt Plaintiff had a right to know.

39.     Upon hearing this news from Ms. Saleeby, Plaintiff was extremely shocked, scared and felt violated, especially because he is a very private person who had never even told family members of the fact he was HIV positive, let alone friends or co-workers, outside of a purely confidential doctor-patient relationship protected by HIPAA's privacy protections.

40.     In fact, Plaintiff went to great lengths to keep his HIV positive status confidential, taking multiple steps to ensure the privacy of his Personal Health Information.  Among other precautions, Plaintiff: (i) initially paid in cash for blood tests so that no insurance claim record would be created confirming his HIV positive status, which is often shared among insurance companies; (ii) Plaintiff asked his physician to submit his blood tests using a fictitious name, as all the blood from his office would be processed through Defendant Aspen Valley Hospital, and he (in retrospect, reasonably) feared one of his co-workers might learn that he was HIV positive; (iii) Plaintiff asked his physician to disguise his diagnosis, which was normally printed on the registration form at the hospital's registration desk and would have been visible to the registration clerks, and he arranged to register in a private officer instead of a reception desk; (iv) Plaintiff, in consultation with his physician, arranged that only the Director of Medical Records and one other staff person would be coding and handling charges for his medical records; and (v) Plaintiff also arranged that he would become a Confidential Patient, whereby his medical records were locked down.

41.     In light of his extremely private nature, evidenced by the many steps he took to keep his status completely confidential, Defendant Miller's outrageous, unauthorized and invasive disclosure of his HIV positive status to a co-worker was particularly damaging to Plaintiff.

### *Defendant Aspen Valley Hospital's Sham Investigation and Cover-Up of Defendant Miller's Outrageous Violation of HIPAA*

42.     On or about June 18, 2014, shortly after revealing Defendant Miller's unauthorized disclosure of his confidential HIV positive status to Plaintiff, Ms. Saleeby met with Defendant Gerson to make a formal complaint against Defendant Miller in connection with this unethical disclosure.

43.    Defendant Gerson informed Defendant Knowles of Ms. Saleeby's allegation against Defendant Miller.

44.    On or about June 19, 2014, Plaintiff recounted Defendant Miller's disclosure of his PHI to his personal care physician, Dr. Ann Mass, MD, who was a member of the hospital's medical staff.

45.    Outraged by the fact that her patient's highly-guarded HIV positive status had been disclosed without his consent, Dr. Mass made a call to then-CEO Dan Bonk to report Defendant Miller's egregious violation of both HIPAA and Defendant AVH's own policies respecting HIPAA privacy protections.  Dr. Mass also received a call from Defendant Gerson that same evening to discuss the incident.

46.    On or about June 20, 2014, Defendant Gerson met with Plaintiff to address Defendant Miller's breach. When Plaintiff explained the value he placed on his privacy and the stigma and embarrassment of having HIV, Defendant Gerson dismissed his concerns, telling Plaintiff HIV was not a "big deal" any longer and suggesting that he "get over it."  Defendant Gerson assured Plaintiff that Defendant Knowles, Chief Compliance Officer, would conduct a thorough investigation, at which Plaintiff expressed concern, knowing that Defendant Knowles and Defendant Miller were good friends.

47.    Much as Plaintiff had suspected, Defendant Knowles and Defendant AVH conducted a sham investigation and made every effort to sweep Defendant Miller's egregious violation under the rug.

48.    On or about June 24, 2014, Defendant Knowles, who as Chief Compliance Officer was entrusted with ensuring the hospital's compliance with HIPAA, met with Plaintiff to discuss this matter.  Defendant Knowles told Plaintiff that although Defendant Miller admitted to

knowing about Plaintiff's HIV positive status, she did not recall how she learned this information

nor did she remember having any conversation with Ms. Saleeby or revealing Plaintiff's PHI to

her.

49.     As a surprise to no one, Defendant Knowles concluded that his friend, Defendant

Miller, was not at fault, despite his having received an email from Ms. Saleeby, containing her

statement of the events and clearly and specifically recalling Defendant Miller's shocking

disclosure to Ms. Saleeby, and her admission that she learned of Plaintiff's confidential

information in reviewing high cost medical records in her capacity as Health Plan Administrator

and Privacy Officer.

50.     Contradicting Defendant Knowles' and Defendant AVH's cover-up of Defendant

Miller's egregious HIPAA violation, the Office of Civil Rights later determined, by a

preponderance of the evidence, that there had been an impermissible use of Plaintiff's protected

health information, which occurred when Defendant Aspen Valley Employee Alicia Miller

shared Plaintiff's name and diagnostic information with a person who had no reason to know,

then Aspen Valley Hospital employee Marlene Saleeby, without a permissible reason to do so.

51.     Despite OCR's conclusive findings, to this day, Defendant AVH has failed to take

full responsibility for its "Privacy Officer" Defendant Miller's outrageous disclosure,

appropriately discipline Defendant Miller, and continues to dismiss the gravity of Plaintiff's

concerns or to apologize.  In a letter to Plaintiff dated August 13, 2015, Defendant Knowles

equivocated:

> As you are aware Aspen Valley Hospital conducted a thorough, internal
> investigation, and found that Ms. Miller did not access your diagnostic
> information through any hospital records or health plan records; but it was
> inconclusive as to where Ms. Miller obtained your obtained your diagnostic
> information.  The investigation determined that Ms. Saleby (sic) was the only
> person with whom Ms. Miller discussed your diagnostic information.  Since

> Ms. Saleby (sic) is no longer an employee of Aspen Valley Hospital… there are no additional efforts that Aspen Valley Hospital can make at this time to reduce any potential harm from the impermissible use of your diagnostic information.

### *Plaintiff's Constitutionally Protected Complaint To The Office Of Civil Rights*

52.     In light of this information that Defendant AVH would not investigate the matter further nor take any corrective action against Defendant Miller, on June 25, 2014, Plaintiff exercised his constitutionally protected First Amendment right by filing a formal complaint with the Office of Civil Rights ("OCR") against Defendant Miller to report her illegal HIPAA violation.

53.     In his complaint to OCR, Plaintiff described the dramatic negative emotional, psychological and physical toll that Defendant Miller's unauthorized disclosure was taking on him, stating he was feeling "bothered, disturbed, irritated, deeply distracted, depressed, and troubled… my stomach is in knots about it and not functioning well because of it" and "[the disclosure] was eating away at me like a cancer."

54.     Knowing Defendants Miller's and AVH's entrenched custom, policy and practice of retaliatory discharge, Plaintiff pleaded to OCR: "I am also fearful of losing my job over blowing the whistle on this matter, hence another reason I am now reporting this willful violation of my privacy."  Unfortunately, it soon turned out that Plaintiff's fear of losing his job in retaliation for his constitutionally protected whistleblowing activity to OCR was well founded.

55.     In the months following his complaint to OCR – but before the OCR complaint was forwarded to his employer – Plaintiff continued to excel at work and received accolades and praise from colleagues, clients as well as his direct supervisor, Defendant Associate IT Director Michelle Gelroth.

***Defendants' Vicious Campaign of Retaliation Against Plaintiff in Response to Plaintiff's***
***Exercise of His Constitutionally Protected First Amendment Rights***

56.     On or about October 7, 2014, both Plaintiff and Defendant AVH received a letter

from OCR, dated October 3, 2014, notifying each of them that OCR was investigating Plaintiff's

complaint against Defendant Miller in connection with her unlawful disclosure of his private

health information.

57.     Although in his entire 11-year career with the hospital, Plaintiff had never had a

negative (or even merely satisfactory) performance review or a single disciplinary write-up, and

up until this point had only received praise and thank you emails from his director supervisor

Defendant Gelroth, on October 21, 2014, just *two weeks* after AVH learned of Plaintiff's

complaint, Plaintiff received an ominous email from Defendant Gelroth indicating she had left an

envelope on his desk, and asked that he "review, sign and return to her desk first thing in the

morning."

58.     The envelope in question turned out to contain the first volley in Defendants'

concerted campaign to retaliate against Plaintiff for filing his constitutionally protected HIPAA

complaint with OCR, namely a disciplinary write-up titled "Performance Counseling

Memorandum."  This first-ever disciplinary write-up was dated October 17, 2014, just *ten days*

after Defendants were notified of Plaintiff's HIPAA complaint by OCR.

59.     In this pretextual disciplinary write-up, written by Defendant Gelroth (at the

behest of her superior Defendant Miller), Defendants accused Plaintiff of failing to transfer the

IT On-Call extension on the evening of October 16, 2014 and falsely stating that Plaintiff had

had prior discipline or counseling regarding this issue, which was contrary to fact.  Although

Plaintiff had made an honest mistake, no other members of the IT Department had ever received

a disciplinary write-up for such minor errors. In fact, upon information and belief, up until that

point, the only employee in the IT Department had received a disciplinary write-up for *anything*

was a drug-addicted employee who engaged in egregious conduct for many months.

60.     Recognizing Defendants' disciplinary write-up for what it was, Plaintiff again

exercised his constitutionally protected First Amendment right to protest illegal retaliation, filing

a second complaint with OCR on October 23, 2014, in which he described Defendants'

retaliatory, pretextual disciplinary action for purported errors and implored the Office of Civil

Rights to seek justice on his behalf.

61.     In the following days, Defendant Gelroth began to accuse and harass Plaintiff via

text messages after working hours over minor work issues, even though she had never before

found fault or complained to Plaintiff, prior to Defendant AVH learning of his initial complaint

to OCR.

62.     During a meeting between Plaintiff and Defendant Gelroth to discuss his

disciplinary write-up on October 27, 2014, Plaintiff explained to that he was in conflict with

Defendant AVH's HR Department concerning a HIPAA violation, without mentioning

Defendant Miller by name.  Defendant Gelroth replied with words to the effect that it must have

been Alicia Miller, as Miller had directed Dawn Gilkerson to assist Gelroth with the disciplinary

write-up, saying she (Miller) should not do it herself.

63.     Defendant Gelroth's remark to Plaintiff demonstrates that Defendant Miller

herself was orchestrating this abusive campaign against Plaintiff in retaliation of the complaint

he had made against her to the Office of Civil Rights, and using her subordinates Defendants

Gilkerson and Gelroth to implement it.

64.     Belying her recent purported negative perception of Plaintiff's performance

reflected in the disciplinary write-up and harassing treatment of Plaintiff (which she was directed

to conduct by Defendants Miller and Gilkerson), on October 29, 2014 Defendant Gelroth

provided Plaintiff with a glowing, and unsolicited, recommendation in an email to Dick Escue,

Chief Information Officer at Valley View Hospital, praising Plaintiff in the following terms:

> I think [Plaintiff] would be an excellent candidate for [the open position].
> [Plaintiff] is extremely organized, learns on-the-job very quickly, and is one of the
> most professional people I know (especially in stressful situations). I think he
> would fit really well with your current team and I know he would keep you guys
> compliant with licensing, policies and change control.

### *Defendants' Retaliatory Treatment Was So Severe As To Require Plaintiff Take Leave Pursuant To The Family Medical Leave Act, Leading To Defendants' Further Retaliation*

65.     Defendant AVH's, and particularly Defendants Miller's, Gilkerson's and

Gelroth's, retaliation and harassment of Plaintiff in late October 2014 caused Plaintiff extreme

stress, anxiety and caused him to have difficulty sleeping. Additionally, this stress exacerbated

Plaintiff's diagnosed tinnitus and jeopardized his fragile health.

66.     Upon the recommendation of his treating physician, Dr. Ann Mass, Plaintiff went

out for approved FMLA leave starting on October 31st and returning to work on December 1,

2014.

67.     While Plaintiff was out on doctor approved FMLA leave in November 2014, he

was informed by two separate co-workers as well as a vendor that during an IT Department

meeting, Defendant Gelroth had announced "when [Plaintiff] returns, he will be in a new role,"

in direct violation of FMLA anti-retaliation provisions.

68.     Indeed, on December 3, 2014, Plaintiff was called into a meeting by Defendants

Gelroth and Gilkerson under the guise of "role optimization," at which time Defendants

presented Plaintiff with a new job description called "Help Desk Coordinator," stripped of many

of his prior duties, technical functions and responsibilities, and reducing his compensation by

approximately $1,800 per month by removing him from on-call rotation, a very lucrative aspect of his job.  Additionally, Plaintiff soon learned that while he was out on FMLA leave, Defendant AVH had hired a new IT Help Desk employee to replace him, in a brazen violation of FMLA.

69.     Upon information and belief, Defendants orchestrated Plaintiff's illegal demotion on December 3, 2015, in direct retaliation for his filing a complaint against Defendant Miller to OCR as well as his FMLA leave, as evidenced by the fact that Defendant Miller herself had drafted Plaintiff's new job description for "Help Desk Coordinator."

70.     Following Plaintiff's return from FMLA and his retaliatory demotion and dock in pay, Defendants subjected Plaintiff to increased surveillance, enhanced scrutiny and continuing emails and text messages threatening him with termination from Defendant Gelroth.  Defendant Gelroth even went so far as to enlist another member of the IT Department to report on Plaintiff's actions to Defendant Gelroth.

71.     Upon information and belief, the guiding force behind Defendants' persecution and harassment of Plaintiff, which was not directed at any other employees, was none other than Defendant Miller herself, the Director of HR who had outrageously, willfully and wantonly disclosed Plaintiff's HIV positive status to then-coworker Marlene Saleeby.

72.     The evident purpose of these actions was Defendants' intent to find any pretextual excuse, no matter how minor, to create a trail of disciplinary actions against Plaintiff in order to justify wrongfully terminating him, which indeed happened less than two months following Plaintiff's return from FMLA leave.

73.     In an effort to find any frivolous and pretextual reason whatsoever to justify Plaintiff's eventual retaliatory termination, on December 29, 2014, Defendants went so far as to falsely accuse Plaintiff of substituting a photograph of his dog for his own photograph in his

AVH Outlook email profile, which itself was completely fabricated and contrary to fact, and to then discipline him for this false allegation which – even if true – would certainly not justify disciplinary action.

***After Plaintiff Filed His Third OCR Complaint and a Complaint with the U.S Department of Labor Objecting to Defendants' On-Going Retaliation, Defendant AVH Responded By Firing Him***

74. Feeling threatened and reasonably fearing for his job as a result of this escalating abusive and harassing retaliatory treatment, on January 3, 2015, Plaintiff once against filed a complaint with the Office of Civil Rights in connection with Defendant AVH's retaliatory conduct, only some of which is described herein, and pleaded for OCR to take corrective actions.

75. On January 10, 2015, Plaintiff also filed a complaint with the U.S. Department of Labor regarding his demotion and reduction in compensation in retaliation for taking approved FMLA leave, in another courageous expression of his First Amendment protected right to alert federal agencies to Defendants' violations of federal law.

76. Unfortunately, as Plaintiff had rightly feared, filing these complaints only led to further retaliation by Defendant AVH. Defendants' illegal retaliation soon culminated in his wrongful termination by Defendant AVH on January 22, 2015.

77. Defendants fired Plaintiff in direct retaliation for (i) Plaintiff's complaint against Defendant Miller regarding her unlawful disclosure of Plaintiff's confidential HIV positive status in blatant violation of HIPAA and hospital policy, (ii) Plaintiff's on-going complaints of retaliation to OCR after his initial filing; (iii) Plaintiff taking approved FMLA leave and (iv) Plaintiff's complaint to the Department of Labor regarding his retaliatory demotion and reduced compensation just two days following his return from FMLA leave.

*Defendant Aspen Valley Hospital's Wrongful, Retaliatory Termination of Plaintiff*

78.     In their efforts to fabricate pretextual reasons to terminate Plaintiff in retaliation

for his constitutionally and federally protected actions that they hoped would pass legal muster,

at Defendant Miller's behest, Defendant Senior HR Specialist Gilkerson, Defendant IT Associate

Director Gelroth, Defendant General Counsel Gerson were meeting with Leslie Miller, AVH's

outside employment counsel, regularly in the days and weeks prior to Plaintiff's retaliatory

termination.

79.     On January 22, 2015, Defendants Gilkerson and Gelroth, pursuant to Defendant

Miller's direction and with the approval of Defendants Gerson, Knowles and AVH, called

Plaintiff into a meeting and promptly terminated him for a multitude of fabricated, inaccurate,

petty reasons that were mere pretext for the real reasons behind his termination.

80.     Defendants justified their illegal, pretextual termination of Plaintiff by outlining

recent disciplinary write-ups, including many inaccurate and wholly fabricated accusations,

which Plaintiff began receiving *just two weeks* after Defendant AVH learned of his initial

complaint to OCR against Defendant Miller, even though until that point Plaintiff had never

received a single negative write-up or even a merely satisfactory performance review.

81.     Seeing the forest for the trees and considering the bigger picture, in particular the

petty, inaccurate, largely fabricated nature of AVH's purported reasons for terminating Plaintiff

as well as the escalating retaliatory campaign, enhanced scrutiny and harassment to which

Plaintiff was subjected by Defendants, beginning just *two weeks* following Defendant AVH's

receipt of the letter from OCR informing it of Plaintiff's complaint against Defendant Miller in

connection with her illegal and unethical violation of HIPAA and of Plaintiff's privacy; the

striking two-day temporal proximity between Plaintiff's return from approved FMLA leave and

his retaliatory demotion and cut in pay; Plaintiff's stellar 11-year tenure of service at AVH, during which time Plaintiff had never once been written up, received any disciplinary action, and in fact had received only outstanding and exceeds performance reviews and was widely known to have a reputation as a friendly, customer-centered "go to guy" in the Hospital; and finally, AVH's, and in particular Defendant Miller's, long-time custom, policy and practice of HIPAA violations and retaliatory discharges and Defendant AVH's failure to discipline offending employees, described in detail below;  in this context it is abundantly clear that AVH's purported reasons for terminating Plaintiff are clearly preposterous and mere pretext for Defendants' wrongful discharge of Plaintiff in direct retaliation for (i) Plaintiff's complaint against Defendant Miller regarding her unlawful disclosure of Plaintiff's confidential HIV positive status in blatant violation of HIPAA and hospital policy, (ii) Plaintiff's on-going complaints of retaliation to OCR after his initial filing; (iii) Plaintiff taking approved FMLA leave and (iv) Plaintiff's complaint to the Department of Labor regarding his retaliatory demotion and reduced compensation just two days following his return from FMLA leave.

82.    As a result of Defendant Miller's outrageous disclosure of Plaintiff's highly confidential private health information, and subsequently Defendant AVH's escalating campaign of persecution, harassment and retaliation against Plaintiff, beginning just two weeks following Defendants' notification of his whistleblowing activity to the Office of Civil Rights, Plaintiff suffered serious emotional distress and health complications.  In the months after he became aware of Defendant Miller's wrongful disclosure, Plaintiff suffered extreme stress, anxiety, depression, sleeplessness, and mental anguish that he described as "eating away at him like a cancer."  He sought treatment with both a therapist and psychiatrist, who prescribed anti-depressant medications.  Defendants' subsequent campaign of retaliation and harassment

exacerbated Plaintiff's diagnosed tinnitus and caused his blood pressure to rise, requiring his

personal physician Dr. Ann Mass to recommend that he take a month-long FMLA leave.

Following his return to work on December 1, he suffering worsening physical and emotional

symptoms and continued meeting with a therapist and psychiatrist until Defendants' wrongful

termination stripped him of his health insurance benefits, at which point he was forced to stop

seeing them because they do not accept Medicaid.

83.     Despite Plaintiff's vigorous efforts, he has been unable to obtain employment in

the Aspen Valley, in part because as part of Defendants' continuing retaliation.

84.     Further, Defendant Miller's unauthorized disclosure and Defendants' wrongful,

retaliatory termination have damaged Plaintiff's personal character and professional reputation,

particularly in light of the small-town nature of the Aspen Valley, where news travels fast and

reputations can be permanently damaged in an instant.

85.     Defendants' wrongful, illegal and vindictive actions, described herein, have

caused Plaintiff to suffer devastating financial, emotional, mental and reputational damages,

harmed his already compromised health and jeopardized his access to the vital anti-viral

medications he needs in order to survive, which medications Plaintiff is now able to obtain

thanks only to Colorado's recent Medicaid expansion.

### *Defendant Aspen Valley Hospital's Custom, Policy and Practice of HIPAA Violations, Retaliatory Terminations, and Failure to Train, Supervise and Discipline Employees*

86.     Unfortunately, Defendants AVH's and Miller's flagrant breach of HIPAA and

hospital policy in revealing Plaintiff's confidential HIV positive status  and the subsequent

retaliatory campaign to which they subjected him, was not an isolated case, but rather was part of

Defendant AVH's custom, policy and practice of illegally disclosing employees' and patients'

Private Health Information, failing to discipline the responsible employees and terminating the

complaining employees in retaliation for exercising their constitutionally protected First Amendment right to bring to light illegal HIPAA violations.

87.    On September 29, 2014, Alicia Schuller, a member of the Aspen Valley Hospital Foundation, requested the IT Department, of which Plaintiff was a member at the time, to create a sophisticated database that would immediately send an email alert to members of the Foundation whenever a "VIP" or wealthy client was admitted to the Emergency Room or the Progressive Care Unit (PCU).  The purpose of this database was to alert Hospital Foundation members, tasked with fundraising for the hospital, so they could visit the ill wealthy individual, taking advantage of the wealthy VIP's vulnerable health and presence at the hospital as a patient to solicit donations for the hospital.  The creation of such a database is in direct violation of HIPAA's privacy protections because such a practice requires the unauthorized sharing of patients' confidential personal medical information and hospital admission to unrelated non-medical staff outside the hospital.

88.    In response to a Freedom of Information Act (FOIA) request made by Plaintiff for any and all information regarding HIPAA related complaints pertaining or relating to Aspen Valley Hospital in the past five (5) years, the Department of Health and Human Services released 42 pages of complaints.  Although most of these complaints are redacted and therefore do not contain names or dates, the full records are in Aspen Valley Hospital's possession and knowledge.  These records and possibly others chronicle a tale of repeated breaches of patients' Private Health Information and Defendant AVH's persistent failure to effectively prevent or stop such disclosures or to discipline the responsible employees.

89.     According to previous complaints of HIPAA breaches made to then-CEO Dave

Ressler and to the Office of Civil Rights, at least one patient complained of such a breach in May

2013, another in January 2014, and yet another in April and/or May 2014.

90.     In May 2013, AC, a patient who had been admitted to Aspen Valley Hospital's

Emergency Department, emailed then-CEO Dave Ressler complaining that an employee had

improperly learned and revealed her Private Health Information, noting "this is not the first time

[redacted] has had information concerning my medical record."  In an email response on May

24, 2013, Mr. Ressler admitted a HIPAA breach had indeed occurred, apologized and promised

that Defendant AVH would take remedial action.

91.     Defendant Elaine Gerson, Chief Counsel, who had initially been contacted by AC

in connection with this incident, apologized profusely for her failure to respond in a timely

manner, saying "I owe you a huge apology!  It was very unprofessional of me and there is really

no excuse I can give you that is acceptable.  Please accept my apologies."

92.     In her OCR complaint, AC writes with regard to the breach in question, "It turns

out that [redacted] was indeed accessing my medical record.  Mr. Ressler said it was 'accident'

however, I doubt it.  This has happened in the past and now I know it to be true.  Another

incident involved our [redacted] in which [redacted] used [redacted]'s position in the ER to

falsify a medical request form to [redacted] Hospital claiming [redacted] needed medical records.

This behavior must be stopped as I live and use Aspen Valley Hospital as a provider."

93.     In another email to then-CEO Ressler, AC, who upon information and belief at

the time worked as an EMT for the Pitkin County Ambulance District and accordingly was an

Aspen Valley Hospital employee, singled out the HR Department for being particularly

unhelpful and unresponsive to her complaints, writing "I continue to complain to Human

Resources, but I am told that there is nothing they can do." This lack of responsiveness is just one example of Defendant Miller's and Defendant Gilkerson's total disregard for upholding HIPAA protections for AVH employees.

94.     On April 7, 2014, ML and his wife, JM, both employees of Aspen Valley Hospital, complained of a HIPAA breach to OCR.  Despite JM's (well-founded) concerns that co-workers might some learn she was a patient at AVH and be able to access her medical records, the employee nevertheless chose receive care at AVH because it is the only healthcare facility within 40 miles.  Following her care at the hospital, the employee had a billing dispute with the hospital's billing department.

95.     Unbeknownst to ML and JM this conversation was recorded.  The day after the employee/patients paid their bill, ML, who was also an AVH employee, was called into a meeting and berated by then-CFO and current Interim CEO Terry Collins, who along with other AVH personnel had listened to the couple's conversation with the hospital's bill collection department without their permission, in a shocking abuse of power and blatant violation of HIPAA privacy regulations.

96.     In her OCR complaint, JM complained "I feel this is a violation of my healthcare privacy, as Terry Collins and [other AVH personnel] should not even have known I was a patient there.  They were clearly aware of [my husband, ML] and my patient records, and I wonder what other violations may have been committed.  I am amazed that the hospital could use our patient records to [redacted] employment as keeping employment and patient records separate seems to be the most basic steps toward privacy in a hospital."

97.     Upon information and belief, ML was terminated on October 10, 2013, the very next day following his meeting with Collins.  Subsequently, on November 19, 2013, Defendants

Wilkinson and Miller asked Plaintiff, then a member of the IT Department, to create a copy of

the secretly recorded phone call for submission in order to contest ML's unemployment benefits

in further retaliation, as Defendants Miller, Gilkerson, Gerson, Knowles, Gelroth and AVH

eventually did to Plaintiff himself, causing him severe financial damages and forcing him to stay

on Medicaid in order to afford life-saving anti-viral medications.

98.     In a letter to Plaintiff dated August 13, 2015, long after his retaliatory termination

on January 22, 2015, Aspen Valley Hospital finally admitted that Defendant Miller has made

multiple unauthorized and illegal disclosure of Private Health Information in contravention of

HIPAA and AVH policies, stating "Aspen Valley Hospital has taken disciplinary steps with

Defendant Miller in accordance with the discipline policy and based upon previous instances of

impermissible use of protected health information, including additional training.  In addition

Aspen Valley Hospital is updating certain privacy policies to provide more concrete example of

Protected Health Information impermissible uses to help prevent similar situations in the future."

(emphasis added).

99.     Despite these alleged remedial actions, illegal HIPAA breaches continue to occur

with disturbing regularity at Defendant Aspen Valley Hospital.

100.    In a videotaped, public meeting of the Aspen Valley Hospital's Board of

Directors that took place on May 9, 2016, when asked by Current Interim CEO Terry Collins

"Without naming names, would you tell about the recent incident of an employee who violated

the HIPAA reg[ulations]s?", Defendant Gelroth replied "Which one?" and laughed.[2] Sitting

silently on Defendant Gelroth's left was Defendant Miller, whose very presence at AVH despite

---

[2] This exchange can be viewed at the 47:07 minute mark of the video found at the following link, which is
available to the public on Aspen Valley Hospital's website:
http://www.aspenvalleyhospital.org/page.cfm?pageid=22407.

her admitted record of HIPAA violations only further demonstrates that Defendant AVH

continues to fail to take its legal obligations to protect employees' and patients' confidential

Private Health Information seriously despite its knowledge of and participation in many such

breaches, only some of which are described herein.

101.    Not only do Defendants Miller and AVH have an record of terminating

employees in retaliation for defending their right to privacy protected by HIPAA, Defendant

Miller also has a record of attempting to illegally retaliate against employees, who, like Plaintiff,

took doctor-approved FMLA leave.  For example, AVH employee Mike Deleon, who was

diagnosed with cancer, went out on approved FMLA leave in order to receive a bone-marrow

transplant.  During his FMLA leave, Defendant Miller led a meeting regarding the need to cut

the hospital's health insurance costs and suggested the cancer-stricken Mr. Deleon, who incurred

high medical costs in connection with his cancer treatment and subsequently succumbed to his

illness, should be demoted to "PRN", or as-needed, service upon his return from his leave,

dramatically cutting his hours and thereby removing him from the hospital's self-insurance plan,

which was not available to "PRN" workers, as a means of cutting Mr. Deleon's high health

insurance costs out of the hospital's bottom line.  Upon information and belief, the only reason

Mr. Deleon was not demoted and cut off the hospital's health insurance plan pursuant to

Defendant Miller's recommendation is that his manager, Philip Cosbos, took a stand against

Defendant Miller's illegal attempt to retaliate against Mr. Deleon for taking approved FMLA

leave.

102.    Defendant Aspen Valley Hospital's custom, policy and practice of HIPAA

breaches and retaliatory discharges, as well as its failure to properly train, supervise and

discipline the responsible employees, including but not limited to Defendant Miller, indicates

that these practices represent the standard operating procedure of the hospital.  These illegal and

abusive practices have severely damaged Plaintiff financially, emotionally, psychologically and

physically, placing his delicate health in jeopardy by cutting off his access to health insurance

(and finally accomplishing Defendants goal of reducing the hospital's health insurance costs) and

contesting his unemployment benefits, forcing him to go on Medicaid in order to be able to

afford his vital HIV medications.

## V. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**42 U.S.C. § 1983 – Fourteenth Amendment Violation –
Fundamental Due Process Right to Privacy
(Against Defendants Aspen Valley Hospital and Alicia Miller)**

103.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if

fully set forth herein.

104.    Plaintiff has a constitutionally protected privacy interest and an expectation of

privacy in his private medical records.

105.    As an employee and patient of a publicly funded county hospital, Plaintiff was

entitled to the Fourteenth Amendment's privacy protections at all times relevant to this

Complaint.

106.    Not only is the privacy interest in one's personal medical records protected by the

Fourteenth Amendment, such a privacy interest is further guaranteed by the HIPAA Privacy

Rule, Colorado state privacy regulations and Aspen Valley Hospital's own policies respecting

the protection of personal health information.

107.    A reasonable person in Defendant Miller's position as Director of Human Resources and Privacy Officer for AVH's Health Plan knew or should have known of Plaintiff's privacy interest in his personal medical records.

108.    Defendant Miller's wrongful, willful and wanton disclosure of Plaintiff's highly confidential medical diagnosis, which she discovered in reviewing his personal health records, as a piece of conversational gossip over drinks with a co-workers at a work function, did not serve a compelling, nor in fact any, legitimate state interest.

109.    Defendant Miller was an agent of Defendant Aspen Valley Hospital. She accessed Plaintiff's private medical records in her capacity as AVH's director of Human Resources, Health Plan Administrator and the Privacy Officer for the Health Plan, and improperly disclosed this information to another AVH employee during the course of a professional event that they attended on behalf of Defendant AVH.

110.    Defendant Miller was an employee of Defendant Aspen Valley Hospital at all times relevant to this Complaint.

111.    As part of her job, Defendant Miller was entrusted with reviewing employee insurance claims data.

112.    The confidential health information improperly disclosed by Defendant Miller was obtained by Defendant Miller through her position at Defendant Aspen Valley Hospital.

113.    Plaintiff's improperly disclosed health information was obtained by Defendant Miller while performing duties which were proper, usual, and necessary to accomplishing her assigned duties and she was acting within the scope of her employment.

114.     Defendant Aspen Valley Hospital, as Defendant Miller's employer, knew or should have known that Defendant Miller would have access to confidential private health information belonging to other employees.

115.     Upon information and belief, Defendant Aspen Valley Hospital was on notice of and had a long-standing, and continuing, custom, pattern and practice of HIPAA violations and has failed to adequately prevent such violations or train and discipline responsible employees.

116.     As Director of Human Resources, Defendant Miller was an agent of Defendant Aspen Valley Hospital.

117.     Defendant Aspen Valley Hospital is vicariously liable for the unconstitutional and tortious conduct of its employees and agents acting within the scope of their employment, as Defendant Miller was.

118.     Because Defendant Miller's disclosure did not serve any state interest, compelling or otherwise, it is irrelevant whether or not it was made in the least intrusive manner possible.

119.     Defendants Miller is not entitled to qualified immunity for the complained of conduct.  Defendant Miller's conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendant's position knew or should have known, as described more fully herein.

120.     At all times relevant to this Complaint, Defendant Miller was acting pursuant to AVH's custom, policy and practice of disregard for enforcing HIPAA's privacy protections, its long-standing and continuing record of ongoing HIPAA violations, its tolerance and ratification of employees' breaches of HIPAA, failing to establish adequate controls or take corrective action in response to such breaches, its ratification of retaliatory discharges of employees in response to such employees' complaints protesting such HIPAA violations, and Defendant AVH's failure to

adequately train and discipline responsible employees in connection with HIPAA breaches and related retaliatory conduct by Defendant Miller and others.

121.    Plaintiff suffered injuries, damages, and losses as a direct and proximate result of Defendants AVH's and Miller's conduct, and AVH's custom, pattern and practice of unmitigated HIPAA violations, failure to train and discipline and its ratification of repeated unauthorized HIPAA breaches by its employees including but not limited to those by its agent, Defendant Miller.

## SECOND CLAIM FOR RELIEF

### Negligence and Negligence Per Se
### (Against Defendants Aspen Valley Hospital and Alicia Miller)

122.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

123.    At all relevant times, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") was a valid statute and was in effect.

124.    Defendant Aspen Valley Hospital is a covered entity under HIPAA and it and its employees are obligated to conform to its implementing regulations.

125.    HIPAA includes a "Privacy Rule," codified at 45 CFR §§160 and 164, which provides national standards designed to protect confidentiality of an individual's health information.

126.    HIPAA also requires covered entities to undertake an appropriate investigation and take appropriate action when the Privacy Rule has been breached.

127.    Colorado medical confidentiality statutes at CRS §25-1-1201, *et seq*. and CRS §27-82-109, as well as Colorado's testimonial and related privilege law at CRS §13-90-107(2), require that medical records and health information be kept confidential.

128.    Plaintiff is within the class of persons intended to be benefitted and protected by HIPAA's Privacy Rule and Colorado's medical confidentiality and privilege statutes, and all applicable laws and regulations protecting against retaliation for opposition to breaches of patient confidentiality and privacy.

129.    Defendants AVH and Miller had a duty to comply with HIPAA and Colorado's medical confidentiality and privilege statutes.

130.    Defendants AVH and Miller breached their duty by improperly disclosing Plaintiff's confidential health information, in AVH's superficial and results-oriented investigation of and attempt to cover up the improper disclosure, in Defendants' failure to take appropriate corrective action including but not limited to, Defendant AVH's failure to address Defendant Miller's misconduct and remove her from a position where she could adversely affect Plaintiff's interest, and Defendants' involvement in and ratification of retaliatory treatment and wrongful termination perpetrated upon Plaintiff following his constitutionally-protected petitions to the Office of Civil Rights and U.S. Department of Labor.

131.    Defendants AVH and Miller acted in a manner which was intentional, willful and wanton, and recklessly indifferent to Plaintiff's rights.

132.    Plaintiff suffered damages as a direct and proximate result of Defendants' AVH and Miller's breaches of the duty they owed to him.

### THIRD CLAIM FOR RELIEF

**Invasion of Privacy in the Nature of Unreasonable Publicity Given to One's Private Life (Against Defendants Aspen Valley Hospital and Alicia Miller)**

133.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

134.     Plaintiff's highly-guarded, confidential medical diagnosis as HIV positive is private in nature.  Prior to the improper disclosure of his health information, Plaintiff had not disclosed his condition to anyone except his doctor and intimate partners, not even to close family members, and took a multitude of steps to ensure that his medical records remained private, including but not limited to by insisting to be designated as a confidential patient in connection with his treatment by physicians at Defendant AVH.

135.     By wrongfully disclosing Plaintiff's highly confidential private health information to a co-worker over drinks at a work function, Defendant Miller effectively and knowingly disclosed the information to the public.  Defendant Miller was aware that AVH and the Aspen Valley is a small community where gossip travels fast.

136.     The co-worker to whom the health information was disclosed subsequently told her husband what Defendant Miller had told her.

137.     Upon information and belief, Defendant Miller disclosed Plaintiff's protected health information to other individuals who had no legitimate or lawful reason to know the information.

138.     Upon information and belief, as a direct result of Defendant Miller's willful and wanton disclosure of Plaintiff's confidential personal health information, at least 15 individuals are now aware of Plaintiff's medical condition, and this number may be significantly higher.

139.     Improper disclosure of Plaintiff's HIV diagnosis is highly offensive to a reasonable person.

140.     Defendant Miller was an agent of Defendant Aspen Valley Hospital, which is legally responsible for her conduct as described herein.

141.    As Director of Human Resources and Health Plan Administrator and Privacy

Officer for Aspen Valley Hospital, Defendant Miller knew, or reasonably should have known,

that Plaintiff's diagnosis was private in nature and of no legitimate concern to the public.

142.    In intentionally, willfully and wantonly disclosing Plaintiff's highly confidential

private health information, Defendant Miller acted with reckless disregard of the private nature

of the fact or facts disclosed and to Plaintiff's rights.

143.    As a direct and proximate result of Defendants AVH's and Miller's invasion of

Plaintiff's privacy based on unreasonable publicity given to one's private life, Plaintiff

experienced injuries, damages, and losses.

## FOURTH CLAIM FOR RELIEF

### Outrageous Conduct/ Intentional Infliction of Emotional Distress
### (Against Defendants Aspen Valley Hospital and Alicia Miller)

144.    Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if

fully set forth herein.

145.    Defendants AVH's and Miller's conduct in casually disclosing Plaintiff's highly

guarded and confidential HIV positive status while having drinks with a co-worker at a work

function, was so outrageous and so extreme that reasonable members of the community would

regard such behavior as atrocious.

146.    In disclosing Plaintiff's health information despite its sensitive nature and its

propensity to cause Plaintiff damage, Defendant Miller engaged in this conduct recklessly or

with the intent of causing the Plaintiff severe emotional distress.

147.    Defendant AVH is liable for the conduct of its agents, including Defendant

Miller.

148.     In directing Defendants Gelroth and Gilkerson to implement the retaliatory campaign of harassment, enhanced scrutiny and inaccurate and largely fabricated disciplinary actions against Plaintiff and orchestrating his termination – all in retaliation for Plaintiff's opposition to their outrageous disclosure of his highly sensitive medical information and exercise of his legal rights under the Constitution and the FMLA  Defendants AVH and Miller intentionally, willfully and wantonly caused Plaintiff severe emotional distress.

149.     As a direct result of Defendants' outrageous conduct, Plaintiff has sustained severe emotional distress and mental anguish, leading to a deterioration of Plaintiff's physical condition.

150.     As a result of Defendants conduct, Plaintiff has suffered actual economic damages and has suffered other injuries, damages and losses, including severe emotional distress and pain and suffering.

## FIFTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – First Amendment Violation – Retaliation
### (Against All Defendants)

151.     Plaintiff hereby incorporates all paragraphs contained in this Complaint as though fully set forth herein.

152.     Plaintiff filed a complaint with the Office of Civil Rights on June 25, 2014, a second complaint with the Office of Civil Rights on October 23, 2014, a third complaint with the Office of Civil Rights on January 3, 2015 and a complaint with the U.S. Department of Labor on January 10, 2015, all conduct which is protected activity under the First Amendment's right to petition the government.

153.     The claims raised and prosecuted by Plaintiff in his complaints to the Office of Civil Rights and to the U.S. Department of Labor were not solely related to only his own rights,

but rather raised issues of significant public concern and rights affecting other employees,

potential employees, taxpayers, and the general public.

154.    Plaintiff engaged in protected activities of speech and petition under the First

Amendment that were not expressed pursuant to his official duties.

155.    Plaintiff's First Amendment-protected activity involved a matter of public

concern.

156.    Plaintiff's interest in protesting Defendants' unlawful violations of HIPAA and of

illegal retaliation, of which Defendants have a custom, policy and practice that has affected many

employees and patients, in connection with his constitutionally protected petitions to the Office

of Civil Rights and the U.S. Department of Labor, and petitioning the government for a remedy

for such illegal activity and retaliation, outweighs any potential disruptive effect of that speech.

157.    Defendants responded to Plaintiff's First Amendment-protected activity with

retaliation, including but not limited to giving Plaintiff pretextual, petty and inaccurate

disciplinary write-ups, demoting Plaintiff and stripping him of many of his previous duties and

responsibilities, taking away his lucrative on-call hours and thereby reducing his compensation

by approximately $1,800 per month, and singling him out for an escalating campaign of

harassment, enhanced scrutiny directed only at him, petty, inaccurate and often-fabricated

disciplinary write-ups, intrusive texts, calls and emails on his off hours and on weekends, and

ultimately terminating him, and other discriminatory and retaliatory practices.

158.    Plaintiff's First Amendment-protected activity was a motivating factor in

Defendants' retaliation against him.

159.    Defendants are not entitled to qualified immunity for the complained of conduct.

Defendants' conduct violated clearly established rights belonging to Plaintiff of which a

reasonable person in Defendants' positions knew or should have known, as described more fully herein.

160.     At all times relevant to his Complaint, Defendants were acting pursuant to AVH's custom, policy and practice of flagrant disregard for enforcing HIPAA's privacy protections, tolerating employees' breaches of HIPAA, retaliatory discharges of employees in response to such employees' complaints protesting such HIPAA violations, and Defendant AVH's failure to adequately train and discipline responsible employees in connection with HIPAA breaches and retaliatory conduct.

161.     Plaintiff suffered injuries, damages, and losses as a direct and proximate result of Defendants' conduct consistent with Defendant AVH's custom, pattern and practice of retaliating against employees who exercise their constitutionally protected First Amendment to protest HIPAA violations in the workplace and petition the government in protesting HIPAA violations by AVH staff, including but not limited to Defendant Miller.

## SIXTH CLAIM FOR RELIEF

### 29 U.S.C. § 2615(a) – Family Medical Leave Act Violation – Retaliation
### (Against All Defendants)

162.     Plaintiff hereby incorporates all paragraphs contained in this Complaint as though fully set forth herein.

163.     Plaintiff engaged in FMLA-protected activity when he went on approved medical leave.

164.     Defendant Aspen Valley Hospital District is an "employer" within the meaning of the FMLA and had direct responsibility for the supervision of Plaintiff.

165.     Upon his return to work from his FMLA-protected leave, Defendants took actions that a reasonable employee would have found materially adverse, including but not limited to:

demoting Plaintiff from his position as IT Helpdesk Technician to a "Help Desk Coordinator," stripping him of many of his previous duties and responsibilities, taking away his lucrative on-call hours and thereby reducing his compensation by approximately $1,800 per month, and singling him out for an escalating campaign of harassment, enhanced scrutiny, petty, inaccurate and often-fabricated disciplinary write-ups, intrusive texts, calls and emails on his off hours and on weekends, and ultimately firing him.

166.    Upon information and belief, Defendant Miller has a record of attempting to retaliate against hospital employees for taking federally-protected FMLA leave.

167.    Additionally, Plaintiff engaged in FMLA-protected activity when he submitted a complaint to the Office of Civil Rights on January 3, 2015 and to the U.S. Department of Labor on January 10, 2015 protesting, among other things, Defendants' retaliatory demotion of Plaintiff just two days after his return from FMLA leave and Defendants' ensuing harassing, retaliatory campaign designed to find pretextual reasons to justify his wrongful and retaliatory termination.

168.    A reasonable employee would believe that Defendants had violated the FMLA through their actions.

169.    After Plaintiff's complaint to the U.S. Department of Labor on January 10, 2015, as well as following Defendants learning of Plaintiff's several previous complaints to the Office of Civil Rights, Defendants took actions that a reasonable employee would have found materially adverse, as described herein.

170.    Defendants' actions would likely discourage a reasonable worker in Plaintiff's position from exercising his rights under the FMLA.

171.    Defendants' proffered reasons for their adverse employment actions and other forms of retaliation are mere pretext for discrimination and retaliation.

172.     Plaintiff suffered injuries, damages, and losses as a direct and proximate result of Defendants' conduct.

### SEVENTH CLAIM FOR RELIEF

**Wrongful Discharge in Violation of Public Policy**
**(Against Defendants Aspen Valley Hospital District)**

173.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

174.     Defendants terminated Plaintiff's employment in retaliation for and/or because, he filed a complaint with the Office of Civil Rights against Defendants AVH and Miller in connection with her outrageous, willful and wanton disclosure of Plaintiff's HIV positive status, he went out on approved FMLA leave and filed additional complaints reporting Defendants' retaliation to the Office of Civil Rights and the U.S. Department of Labor.

175.     The State of Colorado has a clear public policy in favor of freedom of speech and of expression, which includes the right to petition the government for redress of legal violations. *See* Constitution of the State of Colorado, Article II, Section 10.  This policy is also expressed in the First Amendment of the U.S. Constitution, which likewise protects the right to petition government.

176.     Defendants terminated Plaintiff's employment, wholly or in part, because he followed exercised his right to petition the government to report violations of the law in accordance with clearly expressed public policy of the State of Colorado, the protections contained in the Colorado Constitution and the protections embodied by the First Amendment of the U.S. Constitution.

177.     Defendant was aware, or should have been aware, that Plaintiff's actions were based upon his reasonable, good faith and accurate belief that he had a constitutionally-protected right to

file complaints with the Office of Civil Rights and the Department of Labor to report Defendants'

illegal acts, and to go out on doctor-approved FMLA leave.

178.    To the extent that Defendants' custom, policy of practice of HIPAA violations

and retaliatory discharges, either generally or as applied to Plaintiff's conduct, disallows and/or

discourages an employee from reporting Defendants' illegal activity by petitioning the

government, such a policy is contrary to public policy and is therefore void.

179.    Defendants' conduct was willful and wanton and attended by circumstances of

malice and a reckless disregard for Plaintiff's rights.

180.    As a direct result of Defendants' willful, wanton, malicious, and/or reckless

violation of public policy, Plaintiff has suffered and will continue to suffer significant injuries,

damages and losses.

WHEREFORE, Plaintiff John Doe respectfully requests that this Court enter judgment in

his favor and against Defendants Aspen Valley Hospital, Alicia Miller, Dawn Gilkerson, Elaine

Gerson, Stephen Knowles and Michelle Gelroth, and award him all relief as allowed by law,

including, but not limited to the following:

a.    Declaratory, injunctive, and other equitable relief, as appropriate;

b.    Actual economic damages as established at trial;

c.    Compensatory damages, including, but not limited to those for future pecuniary
      and non-pecuniary losses, emotional pain, suffering, inconvenience, mental
      anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.    Punitive/exemplary damages for all claims as allowed by law in an amount to be
      determined at trial;

e.   Liquidated damages for all claims as allowed by law in an amount to be determined at trial;

f.   Pre-judgment and post-judgment interest at the highest lawful rate;

g.   Attorney's fees and costs;

h.   An apology issued to Plaintiff by Defendant Aspen Valley Hospital;

i.   The implementation of policy changes by Defendant Aspen Valley Hospital designed to prevent future breaches of HIPAA and protect patient and employees' privacy;

j.   Appropriate disciplinary action for Defendant Miller; and

k.   Such further relief as allowed by law or as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**.

DATED this 10th day of June 2016.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*

_____

Mari Newman
Darold W. Killmer
Eudoxie (Dunia) Dickey
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001 fax
mnewman@kln-law.com
dkillmer@kln-law.com
ddickey@kln-law.com

*Attorneys for Plaintiff*